Receipt number 9998-4911942

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

FOX LOGISTICS AND CONSTRUCTION

COMPANY,

     Plaintiff,

v.                             No. **18-1395 C**

UNITED STATES OF AMERICA,

     Defendant.

_____

## COMPLAINT
### Parties

1.     Plaintiff, Fox Logistics and Construction Company ("Fox"), is a corporation organized and existing under the laws of Afghanistan, with a principal place of business located at the Fox HQ Parwan 2 Square, Kabul, Afghanistan.

2.     Defendant is the United States of America acting by and through the Department of the Air Force, a/k/a "AF" or AFCEC.

### Jurisdiction

3.     Pursuant to the Tucker Act, 28 U.S.C. §1491 this court has jurisdiction arising from claims arising from a modification of an agreement between the United States and Lakeshore Engineering Services, Inc. ("Lakeshore") of which Fox was designated as an intended third-party beneficiary.

4.     In the alternative, Fox furnished a direct benefit upon the United States by providing labor and materials in connection with repair and construction work performed at Shindand Air

Base in the Herat Province, Afghanistan that created an implied in fact contract between the United States and Fox.

**Facts**

5.      On April 12, 2006, the AF awarded Indefinite Delivery/Indefinite Quantity ("IDIQ") Contract Number ("Contract") to Lakeshore for Heavy Engineering Repair and Construction work at Shindand Air Base, Herat Province, Afghanistan ("Project").

6.      The AF waived the requirement for Lakeshore to provide performance and payment bonds on the Project due to the war hazard conditions.

7.      On August 23, 2012, AF issued Task Order Number FA8903-06-D-8505-0042 ("TO 42") in the amount of $57,317,344 to Lakeshore for infrastructure work on the Project hereinafter referred to as the "Prime Contract".

8.      Fox entered into a Master Service Subcontract ("Subcontract") dated October 24, 2012 with Lakeshore in support of TO 42.  Under TO 42, Fox was responsible for the coordination of construction of the facilities and infrastructure on the Project.  Fox was required to perform and/or provide, inter alia, quality control, construction management, material supply delivery and coordination, long lead material acquisition and coordination, on-site safety and security management, and project documentation.

9.      On January 16, 2013, Lakeshore issued Change Order No. 0001 to Fox in furtherance of Lakeshore's Purchase Order No. P007684 under TO 42.  The Change Order increased Fox's Subcontract by $24,156,000 to $39,488,000.

10.      On May 29, 2013, the AF issued a Show Cause Notice to Lakeshore for Default due to Lakeshore's construction delays and failure to pay its subcontractors.

11.     Lakeshore responded to the Show Cause Notice to Lakeshore for Default stating, inter alia, that it had "resolved all of their cash flow situation because of several recent capital structure enhancements" which "allowed Lakeshore to fully pay its subcontractors and vendors on this project and to ensure they will be paid on a timely basis in the future." In response AF directed Lakeshore to provide and Lakeshore did furnish documentation to substantiate these representations and was permitted to continue its performance.

12.     AF issued a second Show Cause Notice to Lakeshore for Default on July 2, 2013 for failing to pay Fox and other trades. On August 9, 2013 an IDF rocket at approximately 12:55 pm impacted Camp Farda (FOX LSA) inside Shindand Airbase (ANNEXE A). The IDF rocket entered through one of the FOX accommodation buildings just after lunch time wounding 6 and killing 2 of Fox's employees.  Air Force shortly thereafter consented to Lakeshore continuing to perform under TO 42 in part due to excusable delays resulting from the impact of the damage caused by the IDF explosion at the Project.

13.     On January 7, 2014, AF Contracting Officer (CO) Captain Rebecca Ban issued a third Show Cause Notice to Lakeshore for Default under TO 42 that referenced Lakeshore owes Fox $3,551,663.42.  The CO further stated, inter alia, the following: "Unless Lakeshore submits acceptable assurances requested within ten (10) days of receipt of this letter, the undersigned may terminate the task order for default in accordance with FAR 52.249-10, titled "Default (Fixed Price Construction)…Your attention is invited to the respective rights of the Contractor and the Government and the liabilities that may be invoked if a decision is made to terminate for default."

14.     Lakeshore during the ten day notice period informed AF on January 17, 2014, it

was insolvent and unable to pay Fox. Lakeshore furnished a detailed proposal requesting the United States to modify TO 42 and requested AF to pay Fox directly through an escrow or holding account hereinafter referred to as the "Holding Account" or "Special Account".

15.     The CO was placed on notice by Lakeshore on January 17, 2014 that due to its failing financial condition Lakeshore was not financially capable of completing TO 42.

16.     The CO immediately required Lakeshore to forego "any contribution to [its] indirect/direct OH costs" until Fox was fully paid on its invoices.

17.     On or about January 25, 2014 the CO received copies of emails delivered to the CO from Lt. Col. Gregory T. Reich and Major Jajliardo of AF that had originated from Mushtaq Habibi one of Fox's principals advising AF of Fox's condition that it would not return to work under TO 42 until the CO guaranteed payment. Fox informed AF that it would only return to work after the CO took control of the "Holding Account" and verify that Fox was to be paid from the "Holding Account".

18.     The CO per an AF Memorandum dated February 7, 2014 knowingly elected not to terminate Lakeshore for default and instead modified TO 42 to intentionally benefit Fox as an intended third part beneficiary of said TO 42 modifications to the Prime Contract to be paid from the "Holding Account" as follows:

"a.     The government concurs with establishment of the designated holding account and a list of individuals requiring viewing rights was provided to LES on 6 Feb 2014.

b.     LES [Lakeshore] may resume submitting invoices for payment provided that LES continue to submit sub-contractor payment certifications, and that all payments are made in accordance with that certification immediately upon receipt of funds from the government. Until LES is current with all sub-contractors, an agreed upon payment plan with sub-contractors currently in arrears must accompany the payment certification (as indicated in your 17 Jan 14 response, para 7b). This plan must be signed by the subcontractor in question, and include the amounts owed to that sub for work during that invoicing period, the amount that will actually be

4

paid, the total amount that will be left in arrears after payment, and the date anticipated to pay the sub in full…

      c.    At no time will LES be allowed to retain funds for their own in-country expenses in excess of what is approved under the "life support and security" line item on the schedule of values of any given invoice period…

      d.    Once invoices area approved and disbursed to LES, the USG [U.S. Government] will monitor transactions from the designated holding account.  If at any time, transactions do not occur in accordance with the approved sub-contractor payment certification; this task order will be immediately terminated for default. "

      19.    The CO acted at all times as a government agent with authority to contract on the government's behalf and expressly knew on January 25, 2014 and thereafter of a condition precedent to Fox's performance as a sub-contractor, i.e. the receipt of payment to be deposited into the "Holding Account" directly from AF and verification that AF took control of the "Holding Account".

      20.    On February 7, 2014 the CO took specific action to modify the Prime Contract i.e. TO 42 to ensure Fox's continued performance.

      21.    The CO intentionally re-assigned the remittance address of the TO 42 funds from Lakeshore's original bank account to a "Holding Account" designated as an escrow or trust account thereby creating a new entity by the parties.  The CO proceeded to gain direct access to view transactions in the "Holding Account" specifically to verify the "Special Account" or "Holding Account" was labeled as the "AFCEC" account a/k/a "Holding Account".  The CO verified each of Fox's invoices before the CO approved the invoices for payments into the "Holding Account".

      22.    On February 12, 2014 Captain Benjamin Knost sent an email to Fox and copied Lt. Co. Michael Geer and COR Major Karlo Jajliardo and advised Fox "Yes, AFCEC is requesting LTC {Lakeshore} to submit specific payment plans with each invoice to document show much you are being paid.  We have also provided a list of personnel who have been granted viewing rights to the account which these proceeds will be deposited."

23.     At the direction of the CO on February 13, 2014, AF Captain Benjamin Knost, notified Fox by email and copied COR Major Karlo Jajliardo, and Col. Michael Geer that CO took control of the "Holding Account" a/k/a "Special Account" and that Fox was to be paid out of the "Holding Account".

24.     On or about February 14, 2014 in reliance upon the CO's TO 42 modifications and the direct communications between AF and Fox,  AF verified to Fox directly that the CO took control of the "Holding Account" to cause AF the ability to deposit funds directly into the "Holding Account". Upon receipt of AF's verification that the CO took control of the "Holding Account" Fox agreed and did return to work.

25.     Fox made every effort to make its right to payment as an intended third party beneficiary under the TO 42 Prime Contract between Lakeshore and AF as modified known to the government's CO, well before any payments were deposited by AF into the "Holding Account".

26.     The CO expressly knew of Fox's claims and specifically intended to benefit and protect Fox. The CO verified DFAS modified TO 42 by redirecting the payment of AF's TO 42 proceeds into the "Holding Account" with the intent Fox would be paid directly from said "Holding Account" that acted as a new entity.

27.     As a direct result of the CO's actions United States deposited Four Million and Fifty Two Thousand and Eighty Five Dollars and 01/100 ($4,052,085.01)  into the "Holding Account" and said monies were in fact paid directly to Fox.

28.     On or about May 1, 2014, while Fox was performing its remaining work Lakeshore's full staff abandoned the TO 42 Project without any notice to Fox or AF in the middle of the night.

29.     On May 2, 2014, Lakeshore filed a Chapter 7 Bankruptcy petition in United States

Bankruptcy Court for the District of Delaware (Case No. 14-11111(CSS)) hereinafter referred to as the "bankruptcy proceedings".

30.     On May 8, 2014, AF Supervisory Contracting Officer Leticia D. Walton issued a Notice to Show Cause for Default to Lakeshore for, inter alia, TO 42, wherein she acknowledged and admitted that "…since Invoice 29 was paid, the amount in arrears to FOX has increased with each invoicing cycle…".

31.     On May 25, 2017, following a delay resulting from the intervention of the bankruptcy proceedings Fox submitted a "Certified Claim" to the Contracting Officer requesting compensation for unpaid invoices under TO 42.

32.     On October 24, 2017, the Contracting Officer issued a letter refusing to recognize Fox's "Certified Claim" in its entirety.

33.     Fox appealed the Contracting Officer's October 24, 2017 letter to the extent it can be considered a "Final Decision."

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT-THIRD PARTY BENEFICIARY

34.     Fox incorporates paragraphs 1 through 33 above as though fully stated herein.

35.     On January 17, 2014 the CO knew Lakeshore was insolvent and was unable to continue its performance under TO 42.

36.     Fox was at all times an intended third-party beneficiary of the TO 42 modifications established by the CO on behalf of AF and Lakeshore.

37.      The CO received emails from Lt Col Gregory T Reich and Major Jajliardo of the AF that originated from Fox, dated January 23, 2014 and January 25, 2014, that expressly notified

the CO Fox would not return to work until TO 42 funds were deposited directly into the "Holding

Account" and that CO controlled the "Holding Account".

      38.    On or about February 3, 2014 the CO affirmatively took steps specifically

to restrict Lakeshore's use of the TO 42 monies so Fox would be paid direct from the" Holding Account".

The CO did verify that the independent and distinct bank account for the new entity or trust account

was known as AFCEC Harris Bank Account # 3173275 located in Chicago, Illinois was under

review by DFAS and the CO's directly took actions to be able to access the "Holding Account" as

described in the following email by the CO to Lakeshore:

> From:  BAN,  REBECCA  W  Capt  USAF  AFICA  772  ESS/PKA-D  [mailto:rebecca.ban@us.af. mil] Sent: Monday, February 03, 2014 4:05 PM
>
> To: Joseph Saldutti; KNOST, BENJAMIN R Capt USAF HAF AFCEC/CFSE; 'Jajliardo, Karlo M MAJ USAF AFCEC-A'; 'Neal Ridgeway'; Jon Butterworth; SCHOENENBERGER, LARA A GS-13 USAF HAF AFCEC/CFSE; SELL, ERIK M Lt Col USAF HAF AFCEC/CFSE; LIZARRAGA, JOY S CTR USAF HAF AFCEC/CFSS; WALLACE, LASHONE Y GS-12 USAF AFCEC 772 ESS/ PKAD
>
> Subject: RE: Shindand TO 42
>
> Mr. Saldutti, This office has not received a formal document outlining LES's resolution of the DFAS payment issues which was due by 1 Feb 14. I understand that I have been Cc'd on communications between LES and DFAS; however, that does not fulfill the requirement as a valid response and I cannot tell from the exchanges that a satisfactory resolution has been achieved. I need a written confirmation from your company that all issues have been resolved so that we can proceed with evaluating your response to the Show Cause Letter dated 7 Jan 14. Please submit requested documents by COB tomorrow, 4 Feb 14, otherwise I will assume that resolution was not achieved and proceed with Show Cause response evaluation as is. Regards, REBECCA W. BAN, Capt, USAF Chief, Contingency Construction 772d Enterprise Sourcing Squadron/PKA Comm: (210) 395-8846 DSN: 969-8846

      39.    Instead of terminating Lakeshore the CO solicited Fox to complete TO 42, and did so with

the CO's express knowledge of Fox's stated condition that it refused to work on TO 42 until AF

agreed to pay the TO 42 proceeds into the "Holding Account" to pay Fox directly.

8

The CO by taking control to access the transactions as they occurred in the "Holding Account" expressly knew from the January 7, 2014 Notice to Show Cause the Co sent to Lakeshore outlining the funds owed from Lakeshore to Fox, the January 23 and 25, 2014 emails received by the CO sent by Fox refusing to work until AF guaranteed payments to Fox, the invoices that were earmarked for payment to Fox that the CO reviewed that that Fox was an intended to be a beneficiary of the CO's direct actions.

40.     On or about February 6, 2014  the CO accessed the newly established "Holding Account" and verified it was labelled as the AFCEC account. Once the CO verified the "Holding Account" was established the CO entered into an agreement with Lakeshore on February 7, 2014 to modify TO 42 and intended to protect and benefit Fox as follows:

(a)     "Modification by The CO  restricting Lakeshore from receiving any of Fox's portion of funds that Lakeshore could draw under TO 42 from UNITED STATES,

(b)     The CO restricted Lakeshore to be eligible only to draw costs for an office and minimal staff,

(c)     Lakeshore would not be allowed to control or receive any additional funds owing to Fox until Fox was first paid,

(d)     The CO would intervene to directly review, identify and approve the amounts directly owing to Fox for unpaid TO 42 work,

(e)     The CO was to be the final decision maker to earmark, segregate and remove the funds from Lakeshore under TO 42 status, and instead directly pay the TO 42 funds into a newly designated AFCEC account that modified the TO 42 payment terms and was to be approved by DFAS to pay Fox directly,

(f)     The CO was authorized and did in fact resulting from these actions determined the amount for a separate and distinct pool of TO 42 funds the CO intended to pay directly to Fox.

(g)     The UNITED STATES was to take steps to replace Lakeshore's original bank account approved by DFAS where the TO 42 funds were currently being paid with a new "holding account" or "special account",

(h)     The United States agreed to deposit Fox's earmarked funds earned by Fox's into a new "Holding" to act as the depository for segregated and distinct funds to be paid to Fox as the UNITED STATES as agreed in the TO 42 Modifications.

(i)     DFAS was contacted by the CO to implement protective steps for the CO and staff to be able to view and take control of the TO 42 funds earmarked for Fox in the  "Holding Account" or "Special Account".

(j)     The CO expressly intended to benefit and directly pay Fox from the "Holding Account" or "Special Account".

(k)     The United States through the CO agreed to identify and pay into the "Holding Account" TO 42 monies to pay Fox's unpaid invoices and the CO agreed to pay Fox's future TO 42 invoices.

(l)     The CO by the viewing rights that were required for the "Holding Account" to enabled the CO to log into the "Holding Account" or "Special Account" and verify all deposits and withdrawals made by the United States was properly deposited and paid directly to Fox.,

(m)     The Contract Officer modified the TO 42 and that Lakeshore would forego "any contribution to [its] indirect/direct OH costs" until Fox was fully paid on its invoices through the release of funds into the "Holding Account" associated with TO 42.

(n)     DFAS by the direction of the CO received and approved the CO's request for a modification to change the TO 42 funds from being paid in the original TO 42 approved bank account in Lakeshore's name, DFAS modified TO 42 and paid funds with the "Holding Account" labelled AFCEC account at Harris Bank, solicited Fox's cage code numbers and modified Lakeshore's cage code numbers and designation accordingly to seek."

41.     Lakeshore was unable to unilaterally delete its existing bank account, or change a banking account under payments for TO 42 without the express approval by the United States through DFAS.

42.     The change in the remittance address from Lakeshore's original bank account to the "Holding Account" must be approved by an authorized AF representative i.e. the Task Order 42 CO, Administrative Contract Officer or ACO, the Procurement Contract Officer or PCO, the Corporate CO a/k/a CCO and include an AF contract number and appropriate cage code numbers to verify that there is a valid, active contract being performed associated or being modified. In addition the modification was to be compliant under DFARS SUBPART 204.72--CONTRACTOR IDENTIFICATION *(Revised November 14, 2003)* before the CO was able to verify the "Holding Account" was effective.

43.     On March 5, 2014 Karlo M Jajliardo MAJ USAF AFCEC-A was sent an email from Neal Ridgeway of Lakeshore requesting a formal Modification for TO 42. The email from Lakeshore explained "In order to have payments made on FA8903-06-D-8505 0035 and FA8903-06-D-8505 0042 directed into *AFCEC Trust Account*, we would like to request a Modification to

change the Cage Code from 1FSD8 to 72CB7." MAJ Karlo M Jajliardo, USAF AFCEC-A explained the requirement the CO was required to obtain a modification before the "Holding Account" could be effective as per Neal Ridgeway's email, and the Major's email to CO stated as follows:

From: Jajliardo, Karlo M MAJ USAF AFCEC-A

Sent: Wednesday, March 5, 2014 1:18 AM

To: 'LIZARRAGA, JOY S CTR USAF HAF AFCEC/CFSS' ; SCHOENENBERGER, LARA A GS-13 USAF HAF AFCEC/CFSE ; 'BAN, REBECCA W Capt USAF AFICA 772 ESS/PKA-D' Cc: Joseph Saldutti ; Jon Butterworth ; 'Neal Ridgeway'

Subject: RE: (U) Shindand TO 32 and TO 42 UNCLASSIFIED Captain Ban, As you can see below, there is an administrative change needed to allow funds to be delivered to the new special account. Please review and take action as appropriate. Thanks. Very Respectfully, KARLO M. JAJLIARDO, P.E. Major, USAF Contracting Officer Representative, Shindand NIPR: Karlo.M.Jajliardo@swa.army.mil  SIPR:  Karlo.M.Jajliardo@Afghan.swa.army.smil.mil  DSN: 318-458-6349 VOSIP: 308-457-0862 Roshan Cell: (+93) 079-491-3775 -----Original Message-----

From: Neal Ridgeway [mailto:Neal.Ridgeway@ltccorp.com]

Sent: Wednesday, March 05, 2014 10:44 AM

To: Jajliardo, Karlo M MAJ USAF AFCEC-A Cc: Joseph Saldutti (jsaldutti@gridironcapital.com); Jon Butterworth

Subject: Shindand TO 32 and TO 42

Major, As you area aware the "Special Account" has been established for incoming project funds. LTC submitted our letters of direction to AFCEC so that funds can be paid to this new account with our authorization. Even with submitting these letter our recent payment from AFCEC arrived on the old LTC account and then needed to be moved to the special account before wires could be distributed. Apparently in addition to those letter of direction a change in "cage codes" is required. Joe and I have just learned that this change needs to originate with our COR. I have been asked to forward this request below to your attention and action. Please send an email to your contracting officer with the following request: *In order to have payments made on FA8903-06-D-8505 0035 and FA8903-06-D-8505 0042 directed into AFCEC Trust Account*, we would like to request a Modification to change the Cage Code from 1FSD8 to 72CB7. Thank you for your attention to this matter. If you have any questions regarding this request please let me know and I will work with our financial staff in the states to provide a response. Neal Ridgeway, AIA LEED AP Project Executive Lakeshore Toltest Corp. 312-617-4384 Neal.Ridgeway@LTCCORP.com Skype neal.ridgeway.1 UNCLASSIFIED

44.     In order to modify TO 42  AF and Lakeshore jointly arranged with DFAS and other authorized Air Force Personnel to re-assign the TO 42 payment into a "Holding Account" for the

benefit and protection of Fox. The CO tracked DFAS approval to allow the CO to make direct payments into the "Holding Account" per the approved TO 42 modifications as the CO intended :

From: WALLACE, LASHONE Y GS-12 USAF AFCEC 772 ESS/PKAD

Sent: Wednesday, March 5, 2014 1:00 PM

To:   Neal.Ridgeway@ltccorp.com;   Joseph   Saldutti ;   Jon   Butterworth   (Jon.Butter-worth@ltccorp.com); SCHOENENBERGER, LARA A GS-13 USAF HAF AFCEC/CFSE Cc: BAN, REBECCA W Capt USAF AFICA 772 ESS/PKA-D ; Jajliardo, Karlo M MAJ USAF AFCEC-A (karlo.m.jajkiardo@afghan.swa.army.mil); LIZARRAGA, JOY S CTR USAF HAF AFCEC/CFSS ; KNOST, BENJAMIN R Capt USAF HAF AFCEC/CFSE ; BROWDER, HAR-VEY GS-13 USAF AFICA 772 ESS/PKA

Subject: RE: (U) Shindand TO 32 and TO 42

Neal, I'm sorry to hear of the difficulty LTC is experiencing regarding the special accounts. How-ever, the "Cage Code" cannot be changed at the task order level, which is the level at which my immediate office works. In other words, the contract would have to be changed at the basic level in order to modify the Cage Code and only the "Corporate CO" can issue a modification of that magnitude. I'm not sure that he will want to do that simply to accommodate this payment issue as a lot of things are associated with the CAGE but that would have to be his call. Please contact the Corporate CO, Mr. Harvey Browder (210-395-8157 OR harvey.browder@us.af.mil) to discuss further. Thank you!

Lashone Wallace, CIV, MSA, DAF Contract Specialist 772 ESS/PKA lashone.wallace@us.af.mil DSN: 969-8873 COMM: 210-395-8873

45.    The officials acting for the United States including the Corporate CO's, PCO, ACO and TO 42 CO, and their actions taken together as stated herein resulted in the modification of TO 42 that gave rise to Fox's standing as a third-party beneficiary that said authorized government agents approved and ratified and following said approvals Fox was paid from the "Holding  Ac-count". The AF paid Four Million and Fifty Two Thousand and Eighty Five Dollars and 01/100 ($4,052,085.01) directly to into the "Holding Account" and caused Fox to be paid directly said sums.

46.    Thereafter despite these direct payments from the "Holding Account" to Fox the United States AF breached the terms of the TO 42 modification by failing to continue to pay Fox

as an intended third-party beneficiary of the remaining TO 42 contract funds into the "Holding Account".

47.     Fox has been damaged by the Air Force's breach of its duties to Fox by not taking direct action as required to protect Fox's intended third-party beneficiary status, or alternatively to seek in good faith to modify the stay in the bankruptcy proceedings or otherwise to take the appropriate steps to pay the funds earmarked for Fox into the "Holding Account". In reasonable reliance upon the CO's specific actions to modify TO 42 to pay Fox from the "Holding Account". Fox in turn did in fact perform work as the CO requested under TO 42. Fox was damaged as direct result of Air Force's action and is entitled to be compensated as follows:

(a) Fox's unpaid invoices it submitted totaling $2,315,485.55;

(b) Fox's earned retention of $1,035.147.87 ;

(c) Fox's unpaid long lead items, equipment and materials stored in facilities worldwide or located on or near the Project in Afghanistan to this date totaling $8,320,357.75'

(d) The above itemized amounts total $11,670,991.17 and were included in the Certified Claim Fox submitted to the CO.

## SECOND CLAIM FOR RELIEF

## IMPLIED IN FACT CONTRACT

48.     Fox incorporates paragraphs 1 through 47 as though fully stated herein.

49.     If Fox is not deemed to be an intended third-party beneficiary of the express contract between the AF and Lakeshore, alternatively, Fox has an implied in fact contract with the Air Force.

50.     The CO knew on January 17, 2014 that Lakeshore was insolvent and financially incapable of  performing TO 42 given the three earlier Notice to Show Cause Issued to

Lakeshore for Default and that Lakeshore did not have the financial capacity to pay Fox or other-wise complete TO 42. By waiving the Miller Act left the CO was in a precarious position leaving the United States at risk in a war zone project.

51.     Accordingly the CO intended to abandon and abrogate Fox's portion of the contract with Lakeshore and act in direct privity with Fox .In doing so the CO required Lakeshore to waive receipt of funds directly per specific TO 42 modifications and instead cause Fox to be paid from the "Holding Account".

52.      The CO agreed deduct funds owing Lakeshore and agreed to pay Fox from the TO 42 funds that DFAS approved and paid into the "Holding Account".

53.     As a result, Fox and Air Force mutually assented to each other's performance, and Fox thereby developed a direct privy of contract relationship with the United States resulting in their respective 1) mutuality of intent to contract;  2) exchange of legal consideration;  3) the lack of ambiguity in offer that resulted in each party mutually entered into a direct privity of contract relationship;  and 4) by their respective and mutual assent and the performance that followed and therefore each party accepted of the terms of work and AF assented to pay Fox and did cause Fox to be paid direct from the TO 42 payments as identified by the CO from funds the United States deposited as approved by DFAS' into the "Holding Account".

54.     The CO at all times had the actual authority to unambiguously offer and bind the AF to contract with Fox upon specific terms outlined in the TO 42 modifications as described herein.

55.     The CO contracted with Fox in exchange for Fox's performance under TO 42.

56.     The AF manifested its intent to accept Fox's offer return to work  in exchange for the AF otherwise taking steps to protect and compensate Fox by agreeing to establish and control

the Special Account, to pay Fox for the value of the materials and services, it provided under TO 42.

57.     AF individually and jointly acted to knowingly set up the "Holding Account" to protect Fox and obtain DFAS' approval directly for the purpose of benefitting and compensating Fox directly. The CO expressly agreed and expressly restricted Lakeshore from being paid only for its work, and barred Lakeshore from receipt of TO 42 funds until Fox was in fact paid for the work it performed on the Project.

58.     Fox provided materials and services at the approval of the Government in the amount of $11,670,991.17

59.     By reason of the foregoing, Fox is entitled to payment from the AF in the amount of $11,670,991.17 for materials and services provided on the Project.

## THIRD CLAIM FOR RELIEF

### BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

60.     Fox incorporates paragraphs 1 through 59 above as though fully stated herein.

61.     Fox was at all times an intended third-party beneficiary of the Agreement between the AF and Lakeshore.

62.     The AF owed an implied duty of good faith and fair dealing to Fox by virtue of the intended third-party beneficiary relationship.

63.     The AF breach the implied duty of good faith and fair dealing to Fox by abandoning the Project without proper notice and without timely obtaining authority to lift the stay in the bankruptcy proceeding for AF to continue to pay into the "Holding Account" and defunded the TO 42 account without the authority to do so as relates to Fox's interests and independent claims against Air Force.

64.     As a result of the Air Force's breach, or in the alternative Air Force's election to terminate TO 42 for its convenience Fox was not able to be paid in full for materials purchased from suppliers, nor was it able to recover retention held by the AF until completion of the Project.

65.     As a result of the Air Force's breach, Fox was damaged in the amount of $11,670,991.17 plus overhead and profit costs as allowed for a termination by convenience audit as Fox requested in its certified claim filed with the CO.

66.     As an alternative to breach damages, Fox seeks judgment that the contract has been constructively terminated for the convenience of the Government, as claimed by Fox in its certified claim with the CO  and that Fox be permitted to submit a termination settlement proposal to the AF in accordance with the Federal Acquisition Regulations ("FAR") Part 49.

**Request for Relief**

WHEREFORE, Fox prays that this Court enter an order of judgment in favor of Fox and against the United States of America under the First and Second Claims for Relief for Fox's damages in the amount of $11,670,991.17, or such amount as proven at trial, or alternatively under the Third Claim for Relief, Fox seeks judgment that the contract has been constructively terminated for the convenience of the Government, and that it be permitted to submit a termination settlement proposal, seek an alternative dispute resolution as available under the FAR or other applicable

regulations or court sponsored rules, plus interest and reasonable attorney's fees and other costs of

bringing this action, and any other relief the Court may deem appropriate.


Dated September 6, 2018


/s/

Hal Emalfarb, Esq

EMALFARB, SWAN AND BAIN
Attorneys for Plaintiff Fox Logistics and Construction Company
440 Central Ave
Highland Park, Illinois 60035
Phone: 847-432-6900
Fax:    847-432-8950
Email: hal@esb-law.com

Plaintiff Fox Logistics and Construction Company

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 06 day of September 2018

X _____

Signature of Mushtaq Habibi